IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAIʻI

| | |
|---|---|
| JAMES T. DOUGLAS,<br><br>             Plaintiff,<br><br>     vs.<br><br>UNIVERSITY OF HAWAIʻI;<br>ALOYSIUS HELMINCK; HEINZ<br>GERT DE COUET; DOE<br>DEFENDANTS 1–25,<br><br>             Defendants. | Case No. 21-cv-00217-DKW-WRP<br><br>**ORDER GRANTING IN PART AND<br>DENYING IN PART<br>DEFENDANTS' MOTION FOR<br>SUMMARY JUDGMENT** |

Plaintiff James T. Douglas, a Professor of Microbiology at the Manoa Campus of the University of Hawaiʻi ("UH-Manoa" or the "University"), filed a Complaint alleging claims stemming from the University's decision to decommission his laboratory in November 2019.  Dkt. No. 1.  Before the Court is a Motion to Dismiss or, in the alternative, for Summary Judgment ("MSJ") filed by the three named Defendants—the University, the Dean of the College of Natural Sciences, Aloysius Helminck, in his official and individual capacity, and the Chair of the Department of Microbiology and Biology, Heinz Gert de Couet, also in his official and individual capacity.  Dkt. No. 42.

As discussed below, sovereign immunity precludes Douglas' claims for damages under Counts 1–7, along with his claims for injunctive relief under

Counts 2–7, as against the University and Helminck and de Couet in their official capacities.  Additionally, as against Helminck and de Couet in their individual capacities, qualified immunity precludes Douglas' damages claims for violations of federal law under Counts 1–2, and state law precludes his damages claims for violations of state law under Counts 3–7.  The MSJ is therefore GRANTED in these respects.  With regard to Count 1 alone, insofar as it requests injunctive relief for ongoing First Amendment violations, summary judgment is not warranted, as Defendants did not address that claim in their MSJ.

## **LEGAL STANDARD**

Federal Rule of Civil Procedure 12(b)(6) authorizes a Court to dismiss a complaint that fails "to state a claim upon which relief can be granted."  Rule 12(b)(6) is read in conjunction with Rule 8(a), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face'"—in other words, the facts pleaded must "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 566, 570 (2007)).  Factual allegations that only permit the court to infer "the mere possibility of misconduct" are insufficient.  *Id*. at 678.

2

Additionally, summary judgment is warranted on a claim if "the evidence in the record" and "all reasonable inferences from that evidence," when viewed in the light most favorable to the non-moving party, show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Genzler v. Longanbach*, 410 F.3d 630, 636 (9th Cir. 2005). The movant "bears the initial burden of . . . demonstrat[ing] the absence of a genuine issue of material fact." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). If the movant carries that burden, then "[t]o survive summary judgment, [the non-movant] must set forth non-speculative evidence of specific facts" showing there is a "genuine issue for trial." *Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1061 (9th Cir. 2011); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In assessing a motion for summary judgment, all facts and inferences are construed in the light most favorable to the non-moving party. *Genzler*, 410 F.3d at 636; *Coghlan v. Am. Seafoods Co., LLC*, 413 F.3d 1090, 1095 (9th Cir. 2005).

## RELEVANT FACTUAL BACKGROUND[1]

Douglas is a tenured Professor of Microbiology at UH-Manoa.  Complaint ¶¶ 7, 13–16.  He has been employed by the University since 1980 and has enjoyed a career as an esteemed researcher and professor.  *See id.* ¶¶ 14–16; Declaration of James T. Douglas ("Douglas Decl.") ¶¶ 2–7, 21.

In October 2017, Douglas learned that he needed knee replacement surgery and scheduled it for January 2018.  *Id.* ¶¶ 17–18.  He informed his supervisor, de Couet, about the planned surgery.  *Id.* ¶ 17.  Because he had a full class load in the semester beginning in January 2018, Douglas arranged for another professor to cover his lectures while on leave.  *Id.* ¶¶ 20–21.  He returned to work in March 2018.  *Id.* ¶ 23.  In August 2018, Douglas went out on sick leave again, in part due to a heart condition.  *Id.* ¶ 24.  As a result, he was on sick leave from August 2018 until April 2020.  *See id.* ¶¶ 24–31.

Prior to these absences, Douglas had been assigned to teach numerous undergraduate, graduate, research, and mentoring courses at UH-Manoa.  *See id.* ¶¶ 19, 23, 32–34.  He and his students performed research in a dedicated laboratory space in Room 101 of a campus building called Snyder Hall ("Snyder 101").  *See id.* ¶¶ 27–30.

---

[1]This summary construes all facts and inferences in the light most favorable to Douglas.  *See Genzler*, 410 F.3d at 636; *Coghlan*, 413 F.3d at 1095.

On November 1, 2018, a few months after Douglas left on his second sick leave term described above, the University's Institutional Biosafety Committee ("IBC") issued a report citing health and safety issues with Douglas' laboratory in Snyder 101, including:

- Lack of adequate supervision over the lab and the graduate students working in it;

- Unapproved manipulation of laboratory biological materials and their storage in unapproved spaces; and

- Unauthorized entries to the lab by unauthorized persons.

Dkt. No. 48-8. Douglas responded to the IBC report on November 10, 2018. *See* Dkt. No. 48-30.

Throughout the following year, additional communications regarding the safety issues ensued between Douglas and University leadership. Therein, Douglas maintained that the lab neither posed safety risks nor violated safety protocols, while University leadership maintained that it did. According to the University, the safety concerns were not resolved in a timely manner, and, around June 2019, leadership decided to decommission Snyder 101 and dispose of the lab's biological and research contents for the safety reasons cited by the IBC.[2] The

---

[2]*See, e.g.*, Dkt. No. 43-4; Dkt. No. 48-13 (letter from the Director of the Office of Research Compliance to Helminck and de Couet, referencing a June 19, 2019 meeting involving "a proposed timeline for cleanup and destruction of biologicals in the Douglas lab"); Dkt. No. 43-4 (August 1, 2019 memorandum published by Helminck about the purported safety issues); Dkt. No. 43-6 (September 27, 2019 letter from Helminck to Douglas, notifying him of the University's plan to "[b]egin preparation to destroy and to properly dispose of all biological

closure took place between November 14, 2019 and January 27, 2020.  *See* Dkt. Nos. 43-7, 48-26, 48-28 (letter stating destruction would begin on November 14, 2019); Dkt. No. 48-33 (January 27, 2020 email from contractor stating that "decontamination and clean-out of Snyder 101 and adjoining labs" was complete).

On December 2, 2019, Douglas filed a formal complaint against Helminck, de Couet, and others, pursuant to the University's Executive Policy 12.211, alleging "Research Misconduct," including the "malicious destruction of data or other products of research or scholarship."  Dkt. No. 48-31 at 1.

In April 2020, Douglas returned from sick leave.  Complaint ¶ 31.  Shortly thereafter, in July 2020, he learned he would not be assigned any research courses for the fall semester, due to his lack of access to laboratory space following the

---

agents and specimens" in Snyder 101, and instructing him to remove his personal belongings prior to decommissioning); Dkt. No. 43-6 (same letter stating that "the specimens in the laboratory, together with the supplies and equipment, are owned by the University, and not by any single individual"); Dkt. Nos. 48-16–17 (referencing Douglas' October 4, 2019 removal of three boxes of personal items); Dkt. Nos. 48-18–19 (October 8, 2019 email from Douglas to Helminck, arranging an in-person meeting on October 21, 2019); Dkt. No. 48-34 (showing October 21, 2019 in-person meeting took place, at which Helminck informed Douglas a contractor would begin destruction of the lab's biological contents in November); Dkt. Nos. 48-24–25 (October 2019 communications involving Douglas' eleventh-hour efforts to resolve the purported safety issues);  Dkt. No. 48-26 (November 6, 2019 letter from Helminck to Douglas confirming decommissioning would begin on November 14, 2019); Dkt. No. 48-34 (November 8, 2019 email from Douglas to de Couet asking for the key to Snyder 101 in order to "transfer samples" out of the lab); Dkt. No. 48-28 (November 13, 2019 email from de Couet denying such access because the University's required protocols were not in place); Dkt. No. 43-7 (November 15, 2019 letter from Helminck to Douglas, explaining that the University had identified additional safety issues on November 5, 2019, involving unauthorized "select agents" in the lab and denying Douglas further access to the lab for "reasons of health and safety").

decommissioning of Snyder 101. *Id.* ¶¶ 32–33. He alleges that he has since been unable to conduct research, independently or with students. *Id.*

## PROCEDURAL BACKGROUND

Douglas initiated this action by filing a Complaint on May 3, 2021, asserting seven claims against the University and Helminck and de Couet in their individual and official capacities. Dkt. No. 1. The Complaint asserts that the University's past destruction of his laboratory and ongoing failure to provide current laboratory access constituted: (1) an infringement of his First Amendment freedoms of association and speech, and interference with academic freedom, by preventing him from continuing prior research and pursuing future research; (2) a violation of his right to procedural due process because it was done without proper process; (3) a breach of his employment contract with the University; (4) a breach of the implied covenant of good faith and fair dealing; (5) conversion; (6) tortious interference with prospective business advantage; and (7) intentional infliction of emotional distress.[3] Douglas seeks damages for past violations and declaratory and injunctive relief for prospective violations. A jury trial in this matter is scheduled for November 12, 2024. *See* Dkt. No. 55 at 1.

---

[3]The Complaint erroneously labeled this as the eighth cause of action, skipping the seventh. *See* Complaint at 13.

On May 19, 2023, Defendants filed the instant MSJ, Dkt. No. 42, along with a concise statement of facts, Dkt. No. 43.  On June 30, 2023, Douglas opposed the MSJ, Dkt. No. 49, and filed a responsive concise statement of facts, Dkt. No. 48 at 2–4, and an additional concise statement of facts, Dkt. No. 48 at 4–5.  On July 7, 2023, Defendants replied.  Dkt. No. 51.  The Court heard oral argument on these matters on July 21, 2023, *see* Dkt. No. 52, and this Order follows.

## DISCUSSION

I.   **Sovereign Immunity: Claims Brought against the University and the Individual Defendants in their Official Capacities**

In general, the Eleventh Amendment bars suits for damages against "a state, an 'arm of the state,' its instrumentalities, [] its agencies," and state officials in their official capacities.  *Green v. Mansour*, 474 U.S. 64, 67–69 (1985); *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989); *Franceschi v. Schwartz*, 57 F.3d 828, 831 (9th Cir. 1995).[4]  The only exceptions are where the state has unequivocally consented to waive its immunity, and/or where Congress overrides the state's immunity.  *Will*, 491 U.S. at 67–68.

Here, Douglas concedes that the University of Hawai'i, along with Helminck and de Couet in their official capacities, are "arm[s] of the state" that are

---

[4]Sovereign immunity does not preclude damages suits against state officials in their individual capacities for actions taken under color of state law.  *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985) ("[A]n award of damages against an official in his personal capacity can be executed [] against the official's personal assets . . . ."); *see also infra* Sections II–III (describing Douglas' damages claims against Helminck and de Couet in their individual capacities).

protected against damages suits by sovereign immunity. *See* Dkt. No. 49 at 10–12; *see also Mukaida v. Hawaiʻi*, 159 F. Supp. 2d 1211, 1220–22 (D. Haw. 2001) (concluding that the University of Hawaiʻi is "an agency of the State for purposes of Eleventh Amendment immunity"). Douglas also concedes that neither exception to sovereign immunity applies here. *See* Dkt. No. 49 at 10–12.[5] Therefore, sovereign immunity bars all claims set forth in Counts 1–7 for damages arising out of the destruction of Douglas' lab contents, insofar as those claims are brought against the University and against Helminck and de Couet in their official capacities. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106, 117 (1984) (sovereign immunity applies to claims brought under both federal and state law).

With regard to the injunctive relief claims set forth in Counts 1–7, as against the University and Helminck and de Couet in their official capacities, Count 1 survives sovereign immunity, but Counts 2–7 do not. The landmark case, *Ex parte Young*, 209 U.S. 123 (1908), established that the Eleventh Amendment does not preclude suits by individuals against states for *prospective* relief for violations of *federal* law. *See Green v. Mansour*, 474 U.S. 64, 68–69 (1985) (explaining that,

---

[5]The State of Hawaiʻi has expressly waived its sovereign immunity with respect to certain suits. *See* H.R.S. §§ 661-1, 662. However, it is undisputed that these waivers do not extend to suits in federal court. *See also Off. of Hawaiʻian Affs. v. Dep't of Educ.*, 951 F. Supp. 1484, 1491–92 (D. Haw. 1996) (explaining that H.R.S. § 661-1 does not extend to suits in federal court) (citing *Price v. Hawaiʻi*, 921 F.2d 950, 958 (9th Cir. 1990)); *Doe ex rel. Doe v. State of Haw. Dep't of Educ.*, 351 F. Supp. 2d 998, 1018 (D. Haw. 2004) (same for H.R.S. § 662).

under *Young*, a suit challenging the federal constitutionality of a state's action is not precluded by sovereign immunity because "[r]emedies designed to end a continuing violation of federal law are necessary to vindicate the federal interest in assuring the supremacy of that law").  However, *Young* does not apply to claims seeking *retrospective* relief.  *See, e.g.*, *Green*, 474 U.S. at 68 ("We have refused to extend the reasoning of *Young* [] to claims for retrospective relief.").  Additionally, *Young* does not apply to suits against states or state officials for violations of *state* law.  *See, e.g.*, *Pennhurst*, 465 U.S. at 106 ("[I]t is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law.  Such a result conflicts directly with the principles of federalism that underlie the Eleventh Amendment.").

Therefore, *Young* does not permit Count 2 because that claim is not amenable to prospective relief.  There, Douglas asserts that, in 2019 and 2020, the Defendants destroyed his research materials in violation of constitutional procedural due process.  *See* Complaint ¶ 45.  As the destruction is complete, no injunction could undo it.  And "notice relief"—"a declaration that [Defendants'] prior conduct violated federal law"—where "there is no continuing violation of federal law to enjoin" and where there is "no valid injunction to which notice could attach" is not a permissible remedy.  *See Green*, 474 U.S. at 64.  Neither is injunctive relief for any of the violations asserted in Counts 3–7 permitted because

those claims assert violations of state law.  This Court is not authorized to "instruct[] state officials on how to conform their [own] conduct to state law." *See Pennhurst*, 465 U.S. at 106.

Conversely, *Young* does permit Douglas' claim for injunctive relief in Count 1 to proceed.  Count 1 asserts that Defendants are currently preventing Douglas from conducting research, in violation of his alleged First Amendment rights to freedom of association, freedom of speech, and academic freedom, by failing to provide him with a proper laboratory, research course load and students, and other support.  *See* Complaint ¶¶ 39–41.  At oral argument, Defendants candidly conceded that their briefing did not address this claim or provide any basis for its dismissal.  *See* Dkt. No. 52.  Although the Court doubts that it has the authority to interfere with the academic decisions of the University in this respect, the Court has no basis on which to dismiss the claim on the current record.  Therefore, Count 1's claim for injunctive relief fits squarely within the *Young* exception and may proceed.

In sum, Douglas' claims for damages under Counts 1–7, along with his claims for injunctive relief under Counts 2–7, as against the University and Helminck and de Couet in their official capacities, are DISMISSED WITH PREJUDICE on the basis of sovereign immunity.  Douglas' claim for injunctive relief under Count 1 survives.

II.      **Qualified Immunity: Federal Damages Claims Brought against the Individual Defendants in their Individual Capacities**

The doctrine of qualified immunity protects state officials from damages liability for acts taken in the course of their official duties "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 817–18 (1982). In other words, an official is entitled to qualified immunity unless a law that was clearly established at the relevant time showed that his conduct was unlawful and "a reasonable official could not have believed" otherwise. *Somers v. Thurman*, 109 F.3d 614, 617 (9th Cir. 1997); *City of Tahlequah, Okla. v. Bond*, 142 S. Ct. 9, 11 (2021) ("[Q]ualified immunity protects all but the plainly incompetent or those who knowingly violate the law.") (internal quotation marks and citations omitted); *Mitchell v. Forsyth*, 472 U.S. 511, 528 (1985) (qualified immunity protects officials unless "the law clearly proscribed the[ir] actions").

"A right is clearly established when it is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 7–8 (2021) (citation omitted). "Although th[e Supreme] Court's case law does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* (internal quotation marks and citation omitted). "This inquiry must be undertaken in light of the specific

12

context of the case, not as a broad general proposition." *Id.* at 8 (internal quotation marks and citation omitted); *City of Tahlequah*, 142 S. Ct. at 11 (2021) ("We have repeatedly told courts not to define clearly established law at too high a level of generality."); *Anderson v. Creighton*, 483 U.S. 635, 640 (1987) ("[O]ur cases establish that the right the official is alleged to have violated must have been 'clearly established' in a [] particularized . . . sense[.]").

No law that was clearly established in 2019 showed that Helminck and de Couet's conduct, as asserted in Count 1, was constitutionally deficient.  In Count 1, Douglas asserts that the University infringed on his First Amendment freedoms of association and speech, and interfered with his academic freedom, both by destroying his lab and past research materials and by neglecting to provide a new lab, students, and other support conducive to future research activities.[6]  Douglas

---

[6]Count 1 specifically alleges:

> Defendants' conduct and restrictions on Professor Douglas' ability to engage in and conduct academic research without interference have violated his rights that are protected by the First Amendment to the United States Constitution . . . .

> By unduly restricting Professor Douglas' speech and conduct and his ability to engage in academic affairs and supervise graduate students, Defendants are continuing to deprive Professor Douglas of rights secured by the free association and free speech clauses of the First Amendment . . . .

> Defendants' acts complained of herein were and are directed toward intimidating Professor Douglas and chilling the exercise of his protected expressive rights by, among other means, silencing or diluting his message and by deterring persons from joining with Professor Douglas in the lawful exercise of their constitutional rights.

Complaint ¶¶ 39–41.

has pointed to no clearly established law showing that these actions were unconstitutional.  He cites only to *Demers v. Austin*, 745 F.3d 402, 411 (9th Cir. 2014) for the proposition that "teaching and academic writing are . . . a special concern of the First Amendment," and to *Sweezy v. State of N.H. by Wyman*, 354 U.S. 234, 250 (1957), for the proposition that "[t]he essentiality of freedom in the community of American universities is almost self-evident. . . .  Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding . . . ."  These vague principles in no way show that Helminck and de Couet were or are required to provide Douglas with certain types of classes, laboratory space or materials, or research support or that the failure to do so was of constitutional dimension.  Thus, Count 1, insofar as it seeks damages against Helminck and de Couet in their individual capacities, is barred by qualified immunity and is DISMISSED WITH PREJUDICE.[7]

---

[7]The Court notes that, during oral argument and in a short section of his brief in opposition to the MSJ, Douglas also cited to *Turner v. City & Cnty. of S.F.*, 788 F.3d 1206 (9th Cir. 2015), in an attempt to overcome qualified immunity.  *Turner* involved First Amendment retaliation.  Such a claim requires an employee to show "(1) that he or she engaged in protected speech; (2) that the employer took 'adverse employment action'; and (3) that [the protected] speech was a 'substantial or motivating factor' for the adverse employment action."  *Id.* at 1210 (quoting *Coszalter v. City of Salem*, 320 F.3d 968, 973 (9th Cir. 2003)); *see also* Dkt. No. 49 at 11 (citing *Demers v. Austin*, 746 F.3d 402 (2014) (recognizing a state university professor's retaliation claim) and *Weiss v. Perez*, 602 F. Supp. 3d 1279, 1286–87 (N.D. Cal. 2022) (similar)). *Turner* does not help Douglas because, among other things, the Complaint does not identify any protected speech in which Douglas engaged, an omission that is not remedied, even in his MSJ brief.  Absent even a threshold claim of First Amendment retaliation, there is no need to evaluate qualified immunity in that specific context.

Similarly, no law that was clearly established in 2019 showed that Helminck and de Couet's conduct, as asserted in Count 2, was unlawful.  In Count 2, Douglas asserts that his laboratory samples were destroyed absent proper process. However, he has not identified any case law showing what process is required, or that it is "beyond debate" that his supervisors' actions did not meet the requisite standard.  *See Rivas-Villegas*, 142 S. Ct. at 7–8; *Anderson*, 483 U.S. at 639–40 (warning of the dangers of identifying clearly established law at too high a level of generality in the specific context of procedural due process).  The University represents that *it* owned the discarded samples, which were located in *its* laboratory on *its* campus.  *See, e.g.*, Dkt. No. 43-6 (Helminck's letter informing Douglas that "the specimens in the laboratory, together with the supplies and equipment, are owned by the University").  This Court is aware of no clearly established law showing that the University lacks the authority to unilaterally determine that biological materials housed in its campus laboratories present biosafety hazards and to take remedial action, up to and including destruction, and certainly Douglas has offered no authority indicating or even suggesting that such actions would violate the Constitution.  Therefore, as with Count 1, insofar as Count 2 seeks damages against Helminck and de Couet in their individual capacities, these defendants are protected by qualified immunity, and the claim is DISMISSED WITH PREJUDICE.

**III.     H.R.S. § 304A-108: State Damages Claims Brought against the Individual Defendants in their Individual Capacities**

Whether state officials in their individual capacities are subject to state law-based damages claims is a matter of state law.  In Hawaiʻi, under Haw. Rev. Stat. § 304A-108(a):

> [A]ll claims arising out of the acts or omissions of the [U]niversity [of Hawaiʻi] or the members of its board of regents, its officers, or its employees . . . may be brought only pursuant to this section and only against the university. . . .  All defenses available to the State, as well as all limitations on actions against the State, shall be applicable to the university.

By the plain language of this statute, Douglas' state law claims, which arise out of the acts or omissions of University employees, may not be brought against the University employees themselves, but only against the University.  *See* Dkt. No. 42-1 at 17–18 (raising this issue).  Douglas has offered no reason or argument why Section 304A is not dispositive.  *See* Dkt. No. 49 at 12–14 (implicitly conceding the issue); Dkt. No. 52 (oral argument, same).[8]  Therefore, Douglas' damages claim under Counts 3–7, as against Helminck and de Couet in their individual capacities, are DISMISSED WITH PREJUDICE in accordance with H.R.S. § 304A-108(a).

---

[8]"When construing a statute, our foremost obligation is to ascertain and give effect to the intention of the legislature, which is obtained primarily from the language contained in the statute itself."  *Iddings v. Mee-Lee*, 919 P.2d 263, 268 (Haw. 1996).  Thus, a court should "give words [in a statute] their common meaning."  *Id.* at 269; *see also United States v. Flores*, 729 F.3d 910, 914 (9th Cir. 2013) ("[U]nless defined, words in a statute will be interpreted as taking their ordinary, contemporary, common meaning.") (quotation marks and citation omitted).

## <u>CONCLUSION</u>

In accordance with the foregoing, Defendants' MSJ, Dkt. No. 42, is GRANTED as to all claims with the exception of Count 1, which survives only insofar as it seeks prospective injunctive and declaratory relief from the University for ongoing violations of Douglas' First Amendment right to future speech, association, and academic freedom.  All remaining counts and claims are DISMISSED WITH PREJUDICE.

IT IS SO ORDERED.

DATED: August 7, 2023 at Honolulu, Hawai'i.


Derrick K. Watson
Chief United States District Judge

---

*James T. Douglas vs. University of Hawaii, et al*; Civil No. 21-00217 DKW-WRP;
**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT**